Rebecca J. Fortune (SBN 229921)
C. Paul Belva (SBN 330705)
**BUCHALTER, APC**
655 W. Broadway, Suite 1600
San Diego, California 92101
Telephone: (619) 219-5335
E-mail: rfortune@buchalter.com

Attorney for defendants,
CAMP PENDELTON & QUANTICO HOUSING LLC,
LPC PENDELTON QUANTICO PM, LP, and
LIBERTY MILITARY HOUSING HOLDINGS, LLC

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION**

| | |
|---|---|
| LUIS SOSA GUERRERO, ASHLEY SOSA, and A.S., a minor by and through her general guardian ASHLEY SOSA,<br><br>Plaintiffs,<br>vs.<br><br>CAMP PENDELTON & QUANTICO HOUSING LLC, a Delaware limited liability company; and LPC PENDELTON QUANTICO PM, LP, a Delaware limited partnership; LIBERTY MILITARY HOUSING HOLDINGS, LLC, a Delaware limited liability company,<br><br>Defendants. | **Case No.** 5:22-cv-00931-WLH (KKx)<br><br>**DECLARATION OF REBECCA J. FORTUNE IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEY'S FEES AND COSTS [Doc. No. 97-1]**<br><br>Hearing Date: December 15, 2023<br>Hearing Time: 10:00 a.m.<br><br>Cased Filed: June 3, 2022<br>Trial: September 12, 2023 |

\\\

I, Rebecca J. Fortune, declare as follows:

1. I am an adult over the age of eighteen years, a Shareholder at Buchalter, APC, and Co-chair of the firm's San Diego Office Litigation Practice Group. I have been lead litigation counsel for defendants CAMP PENDLETON & QUANTICO HOUSING, LLC, LPC PENDLETON QUANTICO PM, LP, and LIBERTY MILITARY HOUSING HOLDINGS, LLC since the inception of this matter in June 2022. As such, I have personal knowledge of the facts set forth herein and could testify competently thereto if called upon to do so.

2. I am submitting this Declaration in support of CAMP PENDLETON & QUANTICO HOUSING, LLC and LPC PENDLETON QUANTICO PM, LP (collectively, "LIBERTY") Opposition to Plaintiffs' Motion for Injunctive Relief.

**<u>Case Filing & Plaintiffs' Abandonment of Claims</u>**

3. Because the conduct at issue in this matter was undertaken in Twentynine Palms, California, on June 3, 2022, Plaintiffs properly filed their Complaint in the Eastern Division of United States District Court for the Central District of California. (Docket No. 1). As a result, this matter was initially assigned to the Eastern District courthouse located in Riverside, California. For reasons unknown to me, the Court reassigned the matter to the Los Angeles courthouse on its own motion. (Docket No. 14).

4. As filed on June 3, 2022, Plaintiffs' Complaint included five (5) causes of action: (i) Fair Housing Act, (ii) California Fair Employment and Housing Act, (iii) California Unruh Civil Rights Act, (iv) Unfair Business Practices, and (v) Negligence). All five claims were alleged against all three named defendants.

5. Just before the originally set trial date, Plaintiffs' voluntarily dismissed their Third and Fifth claims (Unruh and Negligence). (Docket Nos. 37). Thereafter, Plaintiffs chose not to submit their Fourth Cause of Action to the jury and it was dismissed.

6. On September 11, 2023, Plaintiffs' also dismissed defendant LIBERTY MILITARY HOUSING HOLDINGS, LLC. (Docket No. 62).

7. After a trial continuance occasioned by reassignment to this Court, this matter proceeded to trial on September 12, 2023.

**Defendants Pursued Settlement / Plaintiffs Chose Expensive Discovery**

8. Defendants' joint Answer was filed on July 13, 2022. (Docket No. 10). The same day, Plaintiffs' counsel, Stuart Fagan, sent me a letter with a request to set a Rule 26(f) conference. I responded and Mr. Fagan and I agreed upon a telephone conference to be held on August 3, 2022 at 10:00 a.m.

9. When Mr. Fagan and I spoke on August 3rd, given the relatively simple nature of Plaintiffs' claims and my understanding that Defendants were interested in resolving the matter without the need for protracted litigation, I asked if he – Mr. Fagan

– could let me know what Plaintiffs would settle their claims for at that time. During our August 3rd call, Mr. Fagan told me he needed to speak with his clients and get back to me with a demand. As a matter of practice for the past twenty (20) years, I take contemporaneous telephone notes using Outlook's "Journal" function and am/was able to confirm this topic of discussion on August 3, 2022.

10. On August 10, 2022, Mr. Fagan wrote me via e-mail stating, "I've yet to have an opportunity to speak with my clients about making a potential settlement offer, and I'm preparing to leave on vacation on Saturday morning, so I won't be able to bring a settlement offer right now. I hope to bring one shortly after I get back from vacation. Thanks, for your patience."

11. On August 22, 2022, Mr. Fagan and I appeared remotely for the Initial Status Conference set by then then-assigned District Court Judge, Stephen v. Wilson. (Docket No. 16). As part of Judge Wilson' Order, he confirmed, "[t]he goal should be the early and inexpensive settlement of the cases …"

12. During the August 22, 2022 Initial Status Conference, because of its role as a private partner of the Department of the Navy, the issue of Plaintiffs' ability to bring suit against CAMP PENDLETON & QUANTICO HOUSING, LLC ("CPQH") was raised. At the Conference, the parties and the Court agreed that Plaintiffs could complete a preliminary deposition of CPQH's person most qualified to inquire of these issues and report back to the Court at a further status conference set for September 26, 2022.

13. Plaintiffs took CPQH's person most qualified, Justin Clancy's, in-person deposition on September 12, 2022 in San Diego, California. I attended that deposition on CPQH's behalf. During the course of this deposition, Mr. Fagan asked, and Mr. Clancy explained the relationship between LIBERTY MILITARY HOUSING HOLDINGS, LLC, CPQH, and LPC PENDLETON QUANTICO PM, LP ("LPC"). In particular, Mr. Clancy explained:

a. LIBERTY MILITARY HOUSING HOLDINGS, LLC is the California "dba" for LHM Holdings, LLC, a Delaware limited liability company that provides all training and operational support to the various "Liberty" entities including but not limited to CPQH and LPC. (97:23-98:2);

b. That the United States Navy leased the structures located on the Twentynine Palms ("29P") Marine Corps based to CPQH via a fifty-year ground lease. (91:8-15).

c. That CPQH engaged the property management services of LPC to manage to the property. (91:17-20).

d. And, that Marie Reed was paid by a separate payroll company (LMH Service, Inc.), but ostensibly worked for LPC. (91:22-24).

14. On September 21, 2022, I received a set of Requests for Production of Documents, Requests for Admissions, and Interrogatories served on each of the three named defendants ("Discovery Set 1").

15. On September 22, 2022, I received deposition notices and subpoenas related to Plaintiffs' planned deposition of United States Military Housing employees George Moore, Charise Risper, Amy Presson-Walden, Tacoma Anderson, and Dr. Kara Jindrich. Due to scheduling conflicts, Plaintiffs ultimately conducted the foregoing depositions in January, February, and March 2023.

16. Mr. Fagan did not get back with me regarding Plaintiffs' settlement demand before conducting CPQH's deposition, serving Discovery Set 1, or setting the depositions of five government employees. Before diving into the investigation and drafting phase of Defendants' response to Discovery Set 1 and/or preparing for depositions, I reached out to Mr. Fagan and asked if he had a chance to discuss settlement with this clients. Mr. Fagan told me he was not comfortable submitting a settlement demand without completing the aforementioned discovery.

17. Because Plaintiffs, through their attorney Mr. Fagan, would not engage in any substantive settlement discussion, I had no choice but to complete narrow discovery on behalf of LIBERTY, with the specific intent of nailing down causation (e.g. what evidence was there that Plaintiffs' did, in fact, submit a "reasonable accommodation request") and the amount of Plaintiffs' damages so a meaningful settlement offer could be served. In that regard, and because <u>Plaintiffs had not served Rule 26(a) disclosures</u>, on October 5, 2022, I served a short set of Requests for Production (10), Requests for

Admission (11), and Interrogatories (12) on plaintiffs ASHLEY SOSA and LUIS SOSA GUERRERO (collectively, with their minor daughter A.S., "the SOSAS").

18. In response to the Request for Admission "Please admit YOU drafted the 'Customer Comments' which begin at page CPQH0065[1] of the document attached hereto as Exhibit "1"," MRS. SOSA responded with an objection, claiming the information was not relevant. Plaintiffs responded identically on each occasion wherein Defendants attempted to authenticate MRS. SOSA's comments regarding the size of homes assigned. MRS. SOSA's refusal to authenticate her own comments required totally unnecessary meet and confer efforts.

19. In addition to Requests for Admission related to MRS. SOSA's factual admissions, I also served a set of Requests for Production of Documents seeking production of all documents "evidencing, referring to, or reflecting any and all REASONABLE ACCOMMODATION REQUEST(s) YOU submitted to [CPQH]." Plaintiffs served their response to this Request for Production on November 16, 2022. The response did not include any documents reflective of a "reasonable accommodation request" submitted to LIBERTY. Rather, the only documents produced included A.S.'s private, HIPAA-protected, Exceptional Family Member Program ("EFMP") application

[1] MRS. SOSA's May 4, 2021 ICE Complaint that included the admission,"We were first offered a house in shadow mountain which I explained to our coordinator we have 10,000 pounds of furniture we cannot live in something that small and I don't feel that at my age I should have to sell half of what I own to accommodate housing."

and doctor's assessment. Nor did Plaintiffs' response to discovery include *any* evidence of monetary damage.

20. After receipt of Plaintiffs' response to discovery, disclosing no actual damage, I once again reached out to Mr. Fagan and asked what it would take to settle this case. Again, Mr. Fagan conveyed Plaintiffs' need to complete additional discovery, including depositions, before they would be in a position to submit a settlement demand.

21. On January 25, 2023, Plaintiffs completed the depositions of Charise Risper, Amy Presson-Walden, and Tacoma Anderson.

22. On February 22, 2023, Defendants conducted the deposition of plaintiff ASHLEY SOSA. Though the Notice of Deposition served on Plaintiffs included a request for MRS. SOSA's production of all "COMMUNICATIONS between YOU and any representative of [LIBERTY] regarding a REASONABLE ACCOMMODATION REUEST" at deposition, MRS. SOSA did not bring any documents to her deposition for production.

23. On February 25, 2023, I received a letter from Mr. Fagan accompanied by notices for two additional depositions, and a request to take a greater number of depositions than permitted by the Federal Rules of Civil Procedure. In response to Mr. Fagan's letter, I wrote back, via email on the same day:

> With regard to the additional depositions you are noticing … where are we going with this, Stuart? In the past, I've asked you what it will take to settle the case. So far, your client has made no demand … provided no indication of what the damages are or what would be accepted in settlement. Rather,

> Plaintiffs and your office just keep running up the tab on costs and fees without any effort whatsoever to resolve this case. I'd love to encourage my clients to make an offer in settlement but can't do anything with zero clue as to scope of Plaintiffs' damage claim. Do your clients have any intention of trying to resolve this case short of trial? Or, are they more interested in running up the fees and costs, making settlement impossible?

24. In response to my February 25, 2023 email, above, consistent with his prior comments, Mr. Fagan wrote back, in part, "As far as settlement goes, I believe that I need to nail down a few matters in the depositions, so that your clients can be assured that our claims are legitimate." To wit, I responded,

> With regard to settlement, for the moment, it doesn't really matter what I or my client think of Plaintiffs' case. From a purely cost perspective, I think we should be discussing settlement. I can't do that because Plaintiffs have neither pleaded, alleged, or otherwise articulated any actual damages. Thereafter, discovery to date confirms no plaintiff sought medical or mental health care as a result of Defendants' actions. Last, at least thus far, Plaintiffs have decided not to convey any demand in settlement favoring, instead, incurring the expense of multiple depositions.
>
> My clients would love to settle the case if at all possible but, without any idea of what ballpark we're working within, that is impossible. For example, if your client is looking for several hundred thousand dollars in emotional distress damages by way of settlement, that's unlikely to happen. Conversely, if a demand for emotional distress damages is supported by verifiable actual damages and the emotional distress component is reasonably related to actual damages, that's something different and will be analyzed differently.
>
> For the sake of this conversation, let's assume CPQH failed to provide a reasonable accommodation. What then? What are Plaintiffs' damages? What will settle this case so we can all avoid further expense?

25. On February 27, 2023, Mr. Fagan sent me a "Consent Order and Settlement Agreement" ("Consent Order") – referenced in Mr. Fagan's Declaration submitted in support of Plaintiffs' Motion to Attorney's Fees at Paragraph 6. The Consent sent by Mr. Fagan on February 27, 2023 is attached hereto as **Exhibit 1**. As the Court will note, the Consent Order was meant to be filed, e.g. become part of the public record, and entered as an injunctive order of the Court. In addition to compelling LIBERTY's conduct in relation to other residents, and requiring an amendment to LPC's contract with CPQH (which cannot happen without the participation and agreement of LIBERTY's 50% partner, the Department of the Navy), despite no evidence of violation with regard to other residents, Plaintiffs' proposed Consent Order included a blank space where a damage amount would presumably be included in the future.

26. In response to Plaintiffs' presentation of the foregoing Consent Order, I responded asking why LIBERTY, a private company being sued by a private plaintiff would agree to a Court order requiring compliance with federal and state law whereby LIBERTY was already legally bound. I also asked Mr. Fagan to get a number his clients were willing to settle for "so we can at least try to avoid the incurrence of what will be extraordinary fees and costs given your currently stated discovery plan."

27. Plaintiffs, through Mr. Fagan, ignored my February 27, 2023 request for a settlement demand and, instead, moved forward setting three additional depositions for late March 2023.

28. On March 2, 2023, Mr. Fagan sent a revised Consent Order, altering the injunctive language a bit, and including a damage and fee demand of $475,000. In an effort to understand the basis for the rather substantial demand, I advised Mr. Fagan, "it would be helpful to know how you reach a demand of $425,000 [sic]. With all I know of this case, I can't fathom recommending an offer greater than the cost of litigation. Plaintiffs haven't discussed any information regarding actual damage and admitted to not seeking any mental health assistance as a result of the alleged distress suffered. If you were me, how do you convince a client in this situation to come out of pocket $425k [sic]?? I just don't see it." Mr. Fagan responded, "I trust you know how to handle it. Litigation is expensive. That's the reality of it."

29. With no way to assess LIBERTY's actual exposure, and no evidence of actual monetary damages suffered by Plaintiffs, but wanting to resolve the case without the need for further expense, on March 8, 2023, Defendants conveyed a Rule 68 Offer of Judgment in the amount of $125,000.

30. On March 31, 2023, Plaintiffs conveyed their first settlement demand that did not include a requirement of injunctive relief. However, while the demand offered to settle the matter for $136,200 in damages, it left the issue of fees and costs to be decided via motion.

31. After meeting with my client, on April 10th, I asked Mr. Fagan, "Before Plaintiffs' demand can be substantively considered, the carriers have requested the total

amount of fees and costs Plaintiffs' would be requesting by way of your motion. Are you willing to share this top-end number so I can give my clients some idea of their potential exposure?"

32. On April 10, 2023, Mr. Fagan sent the following regarding fees and costs incurred to date:

> I don't have an exact count of the costs because I've yet to receive all the invoices from the reporters and videographers. But I estimate the out-of-pocket expenses to be in the neighborhood of $30,000. As far as time goes, I've billed approximately 460 hours thus far, and my paralegal has expended approximately 30 hours of time summarizing depositions.

A true and correct copy of my April 10, 2023 exchange with Mr. Fagan is attached hereto as **Exhibit 2**.

33. When I asked Mr. Fagan what his hourly rate was – so I could have a substantive conversation with LIBERTY regarding its total exposure – Mr. Fagan said, "Sorry, but it is my policy not to share my hourly rate, unless I have to file a motion." To which I replied, "Without an hourly rate, my guesstimate of Plaintiffs' fees reflects a possible variance in excess of $100,000. As you may be aware, a carrier is unlikely to make any offer with this much uncertainty. So, while my clients are willing to meaningfully discuss settlement, the vagueness of Plaintiffs' demand will likely make that impossible." Mr. Fagan's response: "Duly noted."

34. On April 15, 2023, Plaintiffs, via Mr. Fagan, conveyed a new offer of $415,000 that included attorney's fees and costs, but revived the demand for a consent

order. Because LIBERTY could not agree to any settlement that would bind the United States Department of Navy (and the change to any internal policies regarding military housing would include such a requirement), LIBERTY could not consider Plaintiffs' demand so long as it included a consent order. In particular, performance demanded by Plaintiffs included an affirmative obligation for LIBERTY to directly communicate with EFMP families. Because a resident's EFMP status is most often confidential, LIBERTY simply could not agree to this type of demand.

35. On April 21, 2023, I sent Plaintiffs, via Mr. Fagan, a proposed settlement agreement. The proposed agreement included nearly all performance obligations requested, but they would be contractual, not pursuant to Court order. And, while the agreement included a payment provision of $125,000, via my transmittal email, I invited Mr. Fagan to make a new demand under $300,000 and I would encourage LIBERTY to consider an increased offer.

36. On April 28, 2023, LIBERTY conveyed an increased offer of $175,000. Mr. Fagan nearly immediately declined.

37. On May 2, 2023, LIBERTY conveyed an increased offer of $200,000. Mr. Fagan conveyed Plaintiffs' rejection the following day.

38. As revealed at trial, the only evidence of Plaintiffs' submission of a reasonable accommodation request to CPQH or LPC any time before March 2022 (as opposed to MRS. SOSA'S communication with representatives of the Military Housing

Office ("MHO") or the United States Marine Corps' EFMP) was an email from MRS. SOSA to former LIBERTY employee Kelly Thompson dated January 26, 2021 (Trial Exhibit No. 71). This email was not produced by Plaintiffs in response to LIBERTY's Request for Production of Documents served in October 2022. Nor was it produced by MRS. SOSA at her deposition in February 2023. Rather, despite the e-mail being from MRS. SOSA's only Gmail account, it was not produced by Plaintiffs until March 20, 2023 … after the deposition plaintiff ASHLEY SOSA, after the deposition of LIBERTY's principal representative, Marie Reed, and after Plaintiffs' attorney had run up over $400,000 in attorney's fees and $30,000 in costs (*See* Paragraph 32, above. E.g. 460 claimed hours x $890/hour + $30,000 in alleged costs).

39. In my opinion, based on my twenty (20) years' experience representing land owners in matters like this one, had Trial Exhibit 71, MRS. SOSA's January 26, 2021 Email to Kelly Thompson, been disclosed in July 2022, August 2022, September 2022 … or any time prior to Plaintiffs' incurrence of $400,000 in legal fees … this matter would have been resolved as LIBERTY was always willing to settle for an amount at least equal to $90,800, the amount ultimately awarded in this matter.

40. It's important to note, this matter is not my first experience having Mr. Fagan as opposing counsel in litigation involving a tenant's submission of a reasonable accommodation request. Rather, when this case was filed in June 2022, I was in the midst of settling a different fair housing matter wherein Mr. Fagan also represented a

plaintiff claiming housing discrimination by his landlord. Similar to this case, I represented the property owner and manager. In that case, as in this one, though his client's damages were fixed and knowable at the time of filing, Mr. Fagan refused to serve a settlement demand prior to the completion of expensive discovery. And, in that case as in this one, when he finally would engage in settlement communications, Mr. Fagan refused to provide any information regarding attorney's fees incurred to date, making it nearly impossible for me to advise my client as to a reasonable amount to offer in resolution of the matter.

**Evidence Submitted in Support of Plaintiffs' Motion**

41. In preparing LIBERTY's Opposition to Plaintiffs' Motion for Attorney's Fees, I reviewed all declarations submitted by Plaintiffs including, but not limited to, the Declarations of Mr. Fagan and Carol Sobel.

42. With regard to Ms. Sobel's declaration, in addition to the formal Objections to its admissibility filed concurrently herewith, I note the following:

a. Ms. Sobel's experience and practice is admittedly in the area of complex civil rights litigation. (*See* Sobel Dec., ¶2). In my opinion, with 20 years' experience representing land owners in fair housing litigation, I do not believe this matter is complex. Instead, to me, the claims and applicable law were and are quite simple.

b. At Paragraph 26, Ms. Sobel admits her only knowledge of Mr. Fagan or this case is via other declarations Mr. Fagan provided her. Her Declaration is wholly silent as to any understanding of the facts or relative complexity of *this* case, how heavily it was litigated, whether Mr. Fagan was, in fact, exceptionally skillful in his presentation, etc. Yet, without this necessary information, Ms. Sobel deems a $890/hour rate reasonable.

c. The comments contained in Ms. Sobel's Declaration regarding what she believes to be reasonable hourly rates, and the declarations attached to her Declaration in support of rates as high as $1,200, all refer to lawyers of national significance, i.e. "the leading attorney in the nation"[2], and lawyers "not available elsewhere" at a lesser rate. In this instance, though I agree Mr. Fagan has always conducted himself with a professional demeanor and has always come to every event well-prepared, there is no evidence before the Court that Mr. Fagan's practice is of national significance or that his particular skill is unavailable at a lesser rate. Indeed, I am a private attorney, paid by my client, not an insurance carrier, and my top rate on this matter is $425/hour, with much of the work for LIBERTY being completed by my 3.5 year associate, Paul Belva, at $325/hour.

d. Ms. Sobel considers only market rates for Los Angeles County attorneys, yet the facts of this case arose in San Bernardino County, and Plaintiffs'

[2] Nadarajah v. Holder, 569 F.3d 906 (2009).

Complaint was filed in the Central District's Eastern Division, e.g. in Riverside County, not Los Angeles. The matter was moved only as a result of the Court's actions. As such, the appropriate venue when considering reasonable hourly rates would be Riverside or San Bernardino Counties, not Los Angeles. In my experience, attorneys in Riverside and San Bernardino demand a lesser hourly rate than San Diego, which commands a lesser rate than Los Angeles. Ms. Sobel's Declaration does not take any of these facts into consideration.

e. At Paragraphs 27-29, Ms. Sobel discusses information set forth within the "2022 Real Rate Report," attaching the Report to her Declaration as Exhibit 2. Not only does Ms. Sobel rely only on Los Angeles County rates, she makes no effort to consider rates applicable to *real estate* attorneys. Rather, she focuses on partner rates for Los Angeles County attorneys practicing in Corporate Regulatory Compliance, Finance & Securities, Intellectual Property, etc. Had Ms. Sobel looked at factors relevant to this case, e.g. Mr. Fagan is a solo practitioner, working out of his personal residence, who accepted representation in a real estate matter arising in San Bernardino County, perhaps she would have seen the Real Report's opinion regarding market rates for San Diego real estate litigation attorneys, working in firms with less than 50 lawyers, who demand as little as $340/hour. (*See* Sobel Declaration, Ex. 2, pp. 59, 61, 140, 170).

43. In reviewing Mr. Fagan's Declaration and the accounting of attorney's fees and costs claimed by Plaintiffs, I note the following:

a. A billing entry dated 9/16/2022 reads, "Reviewed Documents vis-à-vis Defendants' Claim to Be Unaware of Disability". The next entry, on the same day: "Telephone Call with Client Ashley Sosa". Yet, MRS. SOSA's January 26, 2021 email to Kelly Thompson, the only evidence Plaintiffs' request for accommodation was sent to LIBERTY, wasn't produced to Defendants until March 20, 2023. And, despite *Plaintiffs' failure* to disclose, at Paragraph 9 of his Declaration, Mr. Fagan casts blame on LIBERTY for not searching for an email, from a *former* employee, that it didn't know existed until *Plaintiffs* transmitted a copy of Trial Exhibit 71 on March 20th. (*See* ¶38, above).

b. Eleven (11) separate entries on 10/13/2022 reflect a uniform charge of ".3", e.g. 18 minutes, when the only amendment to the referenced deposition subpoenas was to change the date. Similar boilerplate entries occur on 9/26/2022 when the very same subpoenas were previously amended. Except, on 9/26, Mr. Fagan billed ".5" for each of the five entries.

c. Plaintiffs' counsel claims 16.9 hours to prepare for the 9/12/2022 preliminary deposition of CPQH's person most knowledgeable. At the time, no documents had been produced and no other disclosures made.

d. Plaintiffs' counsel claims 47.4 hours preparing Plaintiffs' opening statement for trial.

e. Plaintiffs' counsel claims 51.3 hours preparing Plaintiffs' cross-examination of Marie Reed at trial.

f. Plaintiffs' counsel claims to have spent 11.6 hours summarizing the 139-page deposition transcript of CPQH's person most knowledgeable, 8 hours summarizing the 90-page deposition of George Moore, 17.3 hours summarizing the 203-page deposition of Marie Reed, 7.3 hours summarizing the 83-page deposition of Jill Dorflinger, 6.2 hours on the 70-page deposition of LPC's person most knowledgeable, 5.9 hours on LMH's PMK, and 11.2 hours on his own client, MRS SOSA's 128-page transcript.

g. Plaintiffs are seeking reimbursement for 68.5 hours of Mr. Fagan's travel time to and from his home in Chicago and California. (*See* entries dated 9/11-9/15/2022, 1/24-1/26/2023, 2/21-2/23/2023, 3/10-3/17/2023, 3/22-3/25/2023, 9/9-9/10/2023, and 9/23-9/27/2023). Plaintiffs seek another $6,832.09 in Mr. Fagan's travel expenses, which include long-term parking charges at Chicago's Midway airport, and hotel fees and rental car charges once in California. (*See* **Exhibit 3** attached hereto). In total, Plaintiffs seek nearly $70,000 in attorney's fees and costs incurred because they *chose* to engage an attorney who does not live in the state where their claim arose.

h. At Paragraph 8 of his Declaration, Mr. Fagan states he "chose not to accept any further clients." In my opinion, this case simply did not warrant any attorney's full-time devotion. Indeed, the billing entries noted at sub-paragraphs b.-f.,

above, reflect a totally unreasonable amount of time spent for the relative task. By way of example, I believe Mr. Belva and I provided competent counsel at every stage of this litigation. During the entirety of this litigation, both of us also worked on at least fifty (50) other matters.

i. Also at Paragraph 8, Mr. Fagan notes that his clients' depositions were taken on separate dates. That was at Plaintiffs' instance, not Defendants. I communicated with Mr. Fagan on several occasions near begging to set his clients' depositions. The dates they were ultimately conducted were a result of Plaintiffs' making themselves available, not Defendants' choice.

j. Mr. Fagan notes the service of a subpoena on Dr. Fish, a military doctor. To my knowledge, Mr. Fagan never personally served Dr. Fish with a subpoena, nor did he confirm with any military personnel that Dr. Fish was available and would appear as noticed.

k. At Paragraph 13, Mr. Fagan notes Plaintiffs' September 2023 offer to settle for $35,000 per plaintiff[3], a total of $105,000 … $14,200 more than the jury ultimately awarded.

l. At Paragraph 17, Mr. Fagan notes the need to use the videotaped deposition testimony of Kelly Thompson. In my opinion, use of Mr. Thompson's video deposition would have been significantly cheaper than paying her travel expenses,

[3] Plus attorney's fees and costs via motion.

witness fees, and hourly rate (as required by the United States Marine Corps Office of General Counsel).

m. Plaintiffs seek recovery of $4,521.00 for a "hot seat operator" at trial. Yet, as my own presentation confirms, a trial tech is unnecessary.

44. In have been a practicing trial attorney in the Southern California area for twenty (20) years. In that time I have acted as lead counsel in 30 bench trials and 10 jury trials. All of my trial experience has involved real estate claims. In all of my experience, I have never encountered a real estate litigation attorney who billed more than $550 per hour.

45. In providing representation to LIBERTY in this matter, my former firm and my current firm billed my time at $425 per hour, and Mr. Belva's time at $325 per hour. In my opinion, supported by the 2022 Real Rate Report attached as Exhibit 2 to Ms. Sobel's Declaration, these rates are both reasonable and indicative of the market rate for a matter like this one.

I declare, under penalty of perjury, pursuant to the laws of the United States, that the foregoing is true and correct to the best of my knowledge.

*s/ Rebecca J. Fortune* .
Rebecca J. Fortune